```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3

 4   _____X

 5   TOMIKA HOLMES,                 :

 6              Plaintiff,          : Case No:

 7   vs.                            : 1:22-cv-01478-JEB

 8   WASHINGTON METROPOLITAN,       :

 9   AREA TRANSIT AUTHORITY,        :

10              Defendant.          :

11   _____X

12                      Monday, August 28, 2023

13                      Washington, D.C.  20036

14         The Telephonic 30(b)(6) deposition of LT. HARRY

15   JACOBS, witness, was called for examination by counsel

16   for the Plaintiff, pursuant to notice, conducted remotely

17   and virtually using audio conference technology, before

18   Sharon L. Banks, C. R., a notary public in and for the

19   District of Columbia, commencing at 11:26 o'clock, a.m.,

20   when were present on behalf of the respective parties.

21
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE COMPLAINANT:

 4

 5   DONNA WILLIAMS RUCKER, Esq., 2001 L. Street, North West,

 6   Suite 902, Washington, D. C. 20036

 7   202-787-1900 and FX. 202-640-2059

 8

 9   FOR THE WMATA:

10

11   MICHAEL K. GUSS, Esq., Senior Counsel, Washington

12   Metropolitan Area Transit Authority, Office of General

13   Counsel, 300 7th Street, North West, Legal Department 7E,

14   Washington, D. C., 20024

15    MKGUSS@wmata.com

16

17

18

19

20

21
```

1          MS. RUCKER:  Yes.

2          BY MS. RUCKER:

3     Q    How many witnesses were for her, for the
4  Lieutenant; just so the record is clear?

5     A    I am counting them.

6     Q    Uh, huh.

7     A    Five witnesses.

8     Q    Okay; thank you.

9     Can you - - moving to a different subject area.  Can
10 you tell me what EEO complaints WMATA is aware of that
11 Ms. Holmes engaged in?

12    A    Sure.  We have one from February 24, 2022
13 that was filed with EEO.  And - -

14    Q    Just making sure that I am still receiving
15 you all with my system here.  Were you saying anything
16 else after the February 24th, 2022?

17    A    No.  I am going back and just looking at
18 the... anything - -

19    Q    Okay.  Take your time.  Just call out, Mr.
20 Jacobs when you are on to the next event.  We are going
21 off the record.

1    A         Okay. Thank you for the clarification. I am
2    not aware of any other EEO complaints that she may have
3    filed, officially or unofficially.
4    Q         Just so that I am clear, WMATA is not aware
5    of any EEO activities by Ms. Holmes other than February
6    24th of 2022?
7    A         That's all I am aware of. So - -
8    Q         When you say, "I," you do realize - -
9    A         I as WMATA; yes, ma'am.
10   Q         Okay. Thank you. Just want to make sure the
11   record is clear on that.
12        To the extent that it may help, isn't it true that
13   Ms. Holmes actually began making EEO complaints against
14   WMATA back in 2012 regarding her complaints about how
15   women and people of color were being treated for
16   promotions?
17   A         I am not aware of that.
18   Q         Are you saying WMATA is not aware of that?
19   A         Yes, ma'am. I am not aware. I show no
20   record of it.
21   Q         I just want to be clear, Mr. Jacobs that you

1  are speaking for WMATA.  So are you saying that you have
2  done a search and your representation is that WMATA has
3  no knowledge of EEO complaints dating back to 2012 that
4  Ms. Holmes made concerning how people of color and women
5  were treated regarding promotions?
6       A       I am saying that I have... I can do some more
7  research, but I have no record of it as of right now.
8       Q       Does WMATA have any knowledge of complaints
9  that Ms. Holmes took to Human Resources Department
10 subsequent to 2012 and ongoing regarding her belief that
11 she was being discriminated against in the work place,
12 based upon her gender and the fact that she was a person
13 of color?
14      A       In reference to that EEO complaint that I
15 provided you with the number of, I believe it... that was
16 in that EEO complaint.
17      Q       So you are saying the one you gave me for the
18 2022, February 24th?
19      A       Yes, ma'am.
20      Q       Outside of that, isn't it true that Ms.
21 Holmes went to the Human Resources Department on a

1  somewhat regular basis complaining about what she
2  perceived to be unfair treatment by the Metro Police
3  against women and people of color in the work place?
4              MR. GUSS: Objection to form.
5              THE WITNESS:  I am not aware of it.
6              MS. RUCKER:  I am sorry, Michael.  You said
7  something?
8              MR. GUSS: No.  It was an objection as to
9  form.
10             MS. RUCKER:  Okay.
11             BY MS. RUCKER:
12    Q        And in 2016, isn't it true that Ms. Holmes
13 made a complaint to WMATA about how people of color were
14 being treated regarding promotions and being over looked,
15 based on their - -
16             MR. GUSS:  Objection as to form.  You can
17 answer; if you can.
18             BY MS. RUCKER:
19    Q        Mr. Jacobs?
20    A        Yes, ma'am.  I am aware of what I have
21 provided.

```
1     A         I am unaware.
2     Q         Are you... by that, I mean is WMATA, aware of
3  any EEO complaints made by Lt. Holmes against Chief Boehm
4  for discriminating against her and creating a hostile
5  work environment?
6     A         Yes, ma'am.  It is in reference to the EEO
7  complaint that I have just provided the number - -
8     Q         And - - I am sorry.  Go ahead.
9     A         And that would be - - so I can get the right
10 number for you.  This would be the one in... it says
11 "Issued on 0224, February 24th, 2022."  And that would be
12 the one in regards to a hostile work environment that was
13 filed with the EEO.
14    Q         Isn't it true that an employee can make an
15 EEO complaint without officially filing something with
16 the EEO Office?
17    A         Yes, ma'am.
18              MS. RUCKER:  My system died.  I am back in
19 the best way that I can until we get this worked out.  I
20 can repeat the question that was pending just before my
21 system died.
```

1           BY MS. RUCKER:

2      Q      And that is: Are you aware that individuals

3  within the Metro Police can make an EEO complaint without

4  officially filing a complaint with the EEO Office?

5      A      Yes, ma'am.

6      Q      And to your knowledge, meaning WMATA's

7  knowledge, Ms. Holmes has never done that?

8      A      Yes, ma'am.

9      Q      Can you tell me who... I want to make sure I

10 get the name right. So let me find it here. But before

11 we go there... let me strike that and ask you this

12 question. Can you tell me what findings WMATA has made

13 regarding any EEO complaint that Lt. Holmes has brought

14 forward either to the EEO Office or through email or

15 verbal complaints?

16     A      Regards to the EEO complaint that was issued

17 on February 24th, 2022, EEO did not proceed with any

18 further investigation. I can read what it says for you,

19 if you would like.

20     Q      I am trying to understand what you said. You

21 said, "they did not proceed." Are you saying it was

1  Lieutenant filing a complaint against another colleague,
2  a Brandon Fletcher, Sgt. Brandon Fletcher?
3     A     I don't have a record of an official filing
4  or any filing of that matter or a complaint against Sgt.
5  Fletcher.
6     Q     When you say you don't are you saying that
7  there is no record in WMATA's records reflecting that?
8     A     There is no record.
9     Q     So there is no record in WMATA's system ever
10 showing a complaint that was made by Complainant - -
11 excuse me.  Not Complainant, by the Plaintiff, Lt.
12 Holmes, against a Brandon Fletcher?
13    A     There is no record.
14    Q     Do you know whether there was one made by Mr.
15 Fletcher against the Lieutenant?
16    A     Yes, ma'am.
17    Q     Can you tell me about that?
18    A     Actually, this was a complaint that was
19 brought about from a detective to a sergeant who filed
20 the complaint.  And - -
21    Q     I missed what you said.  What did you say?

1    A        Buccal swab.

2    Q        Tell me what that is?

3    A        It is just the way... collecting DNA in
4  reference to a gun case.

5    Q        And what is it called, a Bugle swab?

6    A        B-U-C-C-A-L.

7    Q        Okay; swab?

8    A        Yes, ma'am.

9    Q        What was the allegation against the
10 Lieutenant, Lt. Holmes?

11   A        That it was misplaced.

12   Q        That she misplaced it?

13   A        That her office misplaced it.

14   Q        If her office misplaced it, that would make
15 her personally responsible for it?

16   A        Possibly; yes, ma'am.

17   Q        No, but I guess what I am trying to
18 understand is if it is something that her office
19 misplaced, why is Brandon Fletcher making a complaint
20 against Lt. Holmes for the missing buccal swab?

21   A        So the complaint was in reference to the

1   missing buccal swab. Sgt. Holmes was a supervisor of
2   property and evidence at that time. So that
3   responsibility would fall to her.
4       Q       Understood. Was it appropriate for Sgt.
5   Fletcher to identify Lt. Holmes as the responsible person
6   for the charge?
7       A       The investigating official, based on the
8   facts would determine who would be the respondent in this
9   case.
10      Q       It came from Chad Eagerton, a detective. And
11  he told this to Brandon Fletcher, a sergeant; right?
12      A       Yes, ma'am.
13      Q       What was Lt. Holmes' rank at the time?
14      A       Sergeant.
15      Q       So Sgt. Fletcher then brought the charges
16  forward for it to be determined whether there should be
17  an investigation?
18      A       So Sgt. Fletcher brought this to the
19  attention... to his supervisor, who contacted... who does
20  initiate the investigation.
21      Q       Who are those supervisors?

```
 1  missing buccal swab.  Sgt. Holmes was a supervisor of
 2  property and evidence at that time.  So that
 3  responsibility would fall to her.
 4       Q        Understood.  Was it appropriate for Sgt.
 5  Fletcher to identify Lt. Holmes as the responsible person
 6  for the charge?
 7       A        The investigating official, based on the
 8  facts would determine who would be the respondent in this
 9  case.
10       Q        It came from Chad Eagerton, a detective.  And
11  he told this to Brandon Fletcher, a sergeant; right?
12       A        Yes, ma'am.
13       Q        What was Lt. Holmes' rank at the time?
14       A        Sergeant.
15       Q        So Sgt. Fletcher then brought the charges
16  forward for it to be determined whether there should be
17  an investigation?
18       A        So Sgt. Fletcher brought this to the
19  attention... to his supervisor, who contacted... who does
20  initiate the investigation.
21       Q        Who are those supervisors?
```

1  it forward to his supervisor and then the supervisor,

2  Captain Alvarez presented it, was it possible for Deputy

3  Chief Nader to say I don't intend to take any further

4  action on this or was he required to conduct an

5  investigation?

6      A        Based on the information that Chief Nader had

7  at the time of receiving the allegations, if he had any

8  allegations that would definitively refute what was

9  levied, then he could not... he could, you know.  I am

10  sorry.  I am not really understanding your question.

11      Q        I think you answered - - basically, you are

12  saying that if he had any definitive evidence, he could

13  say look, I am not going to continue, but with the

14  allegations I have alleged, he needed to go ahead and let

15  this be investigated?

16      A        Exactly; okay.

17      Q        Is that what you are saying?

18      A        Yes, ma'am.

19      Q        In the course of this, this matter was

20  investigated; correct?

21      A        Yes, ma'am.

```
1      A         Oh; okay.
2      Q         - - by Chad Eagerton to Sgt. Fletcher, to
3   Captain Alvarez, to Deputy Chief Nader.  In that
4   investigation, what was the final determination?
5      A         Exonerated.
6      Q         What does that mean?
7      A         That it... it did happen, but it was within
8   policy.
9      Q         It did happen.  So what happened?
10     A         There was some confusion or a
11  misunderstanding with regards to a labeling of the
12  evidence, which caused some confusion.  But the evidence
13  was placed on the property books and it was stored
14  properly and documented properly.
15     Q         Isn't it true that after that exoneration
16  occurred, that Lt. Holmes requested to make a complaint
17  against a coworker, Brian Fletcher for bringing forth
18  that information?
19     A         Yes, ma'am.
20     Q         Was that allegation investigated?
21     A         No, ma'am.
```

1   Q        Why is that?

2   A        The initial complaint was made in good faith.

3   Q        The initial complaint was what?

4   A        Made in good faith.

5   Q        By whom?

6   A        By... well, the investigation itself was
7   initiated as I say, in good faith.  So Detective Eagerton
8   in making notification to the sergeant and thus that...
9   that complaint or potential issue being forwarded up
10  through the chain of command, the initiation of the
11  investigation was made based on good faith that there was
12  a policy violation that there was some missing evidence.

13  Q        Going back, for a moment, to the allegation
14  that Lt. Holmes made about her colleague... and this is
15  under that 098 matter, had made a false statement in an
16  open forum.  Was it determined that that false statement
17  had not, in fact, been made?

18  A        It was determined that the statement had been
19  made, but there may have been an error in interpretation
20  on the part of Lt. Holmes.  And thus, there was a not
21  sustainment for the intentional lying.