THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TOMIKA HOLMES, ) | |
| ) | |
| *Plaintiff*, ) | Civil Action No. 1:21-CV-01478-JEB |
| ) | |
| v. ) | |
| ) | |
| WASHINGTON METROPOLITAN ) | |
| AREA TRANSIT AUTHORITY ) | |
| ) | |
| *Defendant*. ) | December 4, 2023 |

**PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HER OPPOSITION**

I, Tomika Holmes, being duly sworn, hereby swear under oath and the penalty of perjury that the below statements are, to the best of my knowledge, true and correct.

1. I am employed by the Washington Metropolitan Area Transit Authority (hereinafter "WMATA") as a Police Lieutenant within District 3, Patrol Operations Bureau.

2. During my time as a Lieutenant, I have been the subject of numerous acts of unlawful employment actions based on race and sex discrimination.

3. I believe overarching emboldening of discriminatory practices at the hand of *retired* Chief of Police – Ronald A. Pavlik Jr., began prior to my promotion to Sergeant in 2008. However, shortly after my promotion to Sergeant in 2008, I was selected for a premier assignment working directly for the Chief of Police as a Special Assistant. This assignment required providing Chief of Police directed guidance to Commanders which included then Captain Ronald Pavlik. While providing corrective guidance to Captain Pavlik, he slammed his work product which was being outlined for correction on my desk stating, "I'm a Captain, I don't take orders from no Sergeant!", I politely commented that the

corrective actions were coming directly from the Chief, I believe his previous comment concerning the promotional list and this particular unprofessional outburst – which was reported to the Chief of Police – is pertinent, as I believe this was the beginning of the critical role he would consistently play in creating an organization riddled with disparate treatment, biased based practices and blatant retaliatory actions against me and other African American females / persons of color as it relates to: unequal and unfair workplace practices, unequal and unfair opportunities for advancement, unequal and unfair promotional practices, and an environment free from biased based disciplinary and retaliatory actions.

4. Over the course of approximately 8-years under the management of retired Chief of Police – Ronald A. Pavlik Jr., I have been disparately disciplined for actions for which white officers are not disciplined or receive a lessor level of discipline, which covertly and/or overtly has caused disparities in promotion, pay increases, assignment opportunities, and forced retirements and/or demotions in rank.

5. As a result of this disparate treatment, I submitted several internal complaints regarding these discriminatory employment practices perpetrated by Chief Pavlik. I also complained through WMATA's OIG, OEEO, and/or Labor Relations who continued "no cause" findings of complaints of discriminatory practices, which only emboldened the racist, sexist behaviors resulting in years of continued discrimination, harassment, gaslighting, and ruling by fear; effecting every member of color on the police department. It was told to me that I had been labeled as an EEO complainer and had a target on my back.

6. Despite complaints and recommendations from WMATA's Human Resources, I have consistently been subjected to disparate treatment, discrimination, hostile work

environment, and retaliatory actions under the encouragement, direction, and ultimate approval of Ronald Pavlik Jr. spanning from his time as a Captain, Deputy Chief and Chief of Police. Many of these actions were in the form of placing me under frivolous investigations and/or instituting unwarranted discipline against me.

7. On or around December 5, 2016, I was investigated and received a Letter of Reprimand for a long-standing practice of attending training which started prior to the tour of duty, and responding to your District assignment after the training which would run into the start of your tour of duty. On October 11, 2016, I had attended a training prior to my tour of duty in which I was scheduled as Watch Commander. On that day, I was observed utilizing my privately owned vehicle when I had appeared to begin my Watch Commander duties. I was investigated for violating General Order #215 and eventually issued a Letter of Reprimand for such violation. However, as noted in my rebuttal to the charge as provided, I was not in a pay status at the time I was observed utilizing my privately owned vehicle. Since I was appearing for my tour of duty from a training, I was not in fact on duty at that time and therefore did not violate General Order #215.

8. On or around August 7, 2017, I was issued a letter of reprimand for inappropriately earned compensatory time without approval in order to complete administrative tasks after an internal audit on timekeeping. However, there were no PeopleSoft entries for "compensatory" time utilized or earned. Further, at no time did my supervisor deny submitted timecard(s) with notations or provide guidance into preferred method of regaining time worked in excess of the 8-hour tour.

9. On or around September 27, 2017, I received a five (5) day suspension, without pay, for allegedly failing to provide a Command Notification regarding the kidnapping of a

    WMATA bus operator. However, not only was a notification made, but a conversation took place with the Deputy Chief of Patrol Operation, Kevin Gaddis. Moreover, I also spoke with the incoming Watch Commander, the Criminal Investigation Unit regarding possible charges despite the fact that I was not the official handling the incident scene. Additionally, after the arrest and subsequent charge was confirmed, I was in transit to the District to complete administrative requirements to turn over the Watch Commander duties to the Captain. The incoming Watch Commander was relayed the conversation(s) which had taken place, the current status of the case, and all relevant information which required no intervention needs as the assailant had been transported for processing.

10. On or around April 6, 2018, I received a written warning for failing to properly staff my shift on Easter Monday of 2018. The allegation states that I improperly approved the leave of five (5) officers for Easter Monday when six (6) other officers were either in mandatory training or participating as instructors. However, I approved the leave requests in February 2018, several months prior to the holiday with the information and duty status of members at the time – none of which were noted to be in mandatory training as participants or instructors. Between March and April 2018, Stephen Boehm, as the acting District Commander, approved two (2) officers to be loaned to the Training Division for use on April 2 to assist in fulfilling mandatory in-service re-training and three (3) members who were in designations not present on February 4 and 6, 2018 when I had approved the leave requests.

11. On or around November 1, 2018, I received a letter of reprimand for an alleged violation of MTPD General Order 231 as I was accused of having failed to contact a citizen who complained about a traffic stop and then failed to start a preliminary investigation into said

traffic stop. On Monday, July 30, 2018, I overheard a conversation Sergeant Roberto Stokes was having with what was later learned to be MTPD DVEU – Ms. Victoria Robinson. I instructed the Sergeant to allow me to speak with Ms. Robinson to inquire as to the nature of the issue and what assistance, if any, I could provide. Having a professional relationship with Ms. Robinson, I greeted her and asked how I could be of assistance. Ms. Robinson stated, "I'm not understanding why my personnel was pulled over, is this what we do now?" I inquired as to what incident she was referring to. She then informed me a DVEU vehicle was the subject of a traffic stop by MTPD officers. I placed Mrs. Robinson on hold to inquire who was operating the vehicle in question (the preliminary investigative process) and was approached by Sergeant David Yashinskie who stated he and Sergeant Flinn were the officials who conducted the traffic stop Ms. Robinson had referenced. I spoke to both Officials to gain a clearer understanding of exactly what had transpired. They stated they observed an unmarked vehicle displaying MTPD tags which was not consistent with other unmarked vehicles in the fleet. They stopped the vehicle to make sure the driver of the vehicle was an MTPD employee. Once the identity of the operator was learned and that he was an employee, the operator was given an explanation and released. After speaking with Sergeant Flinn and Sergeant Yashinskie, I was assured there was nothing unusual about their reasoning or the performance of their traffic stop. I returned to the conversation with Ms. Robinson in an attempt to inform her of the facts surrounding the stop to include relaying that her supervisor, Mr. Shawn Doody, had already been contacted. Ms. Robinson stated, "I'll just have him call you" referring to Mr. Hankins. I provided my contact information to Ms. Robinson for Mr. Hankins to contact me directly. I did not receive any follow up from any DVEU personnel.

12. On or around January 4, 2019, I received a letter of reprimand for allegedly violating MTPD General Order 255 because I granted six (6) MTPD police officers leave above the two (2) officer allowance given by my commanding officer. there was never an *order* given restricting leave without the approval of the District Commander. The Section Commanders (me) were solely in charge of granting or denying leave based an arbitrary number which changed daily. In fact, I was the only Section Commander who worked with Assistant Chief Anzallo to establish a statistical approach to approval leave based upon the percentage of personnel needed to staff all sectors and beats within the section. Stephen Boehm disseminated an email to Sergeants reminding them not to approve leave, an assignment not carried out by their rank in the Section in which I commanded. As the Section Commander, careful consideration, situation and circumstances, sound judgement, and resource allocation concerns were made for every leave approval. The section in which I commanded was the highest producing officers with the highest results of warrants execution and overall productivity. I approved (6) members for leave over a (3) month time period utilizing the statistical approach resulting in (22) Officers working on the shift, which was over and beyond the subjective manpower level of (18) as outlined by the Stephen Boehm.

13. On or around January 10, 2019, FAIR issued the results of its internal investigation into my 2018 above-mentioned internal complaint finding that MTPD had legitimate, non-discriminatory reasons for each action it instituted against me. I complained through WMATA's OIG, OEEO, and/or Labor Relations who continued "no cause" findings of complaints of discriminatory practices or retaliation, which only emboldened the racist,

sexist behaviors resulting in years of continued discrimination, harassment, gaslighting, and ruling by fear, effecting every member of color on the police department.

14. On or around December 30, 2020, I was issued a written dereliction for allegedly violating General Order 215 when I was cited for ordering two junior officers to sign a Talent Release form without telling them it was consensual. Officers in uniform are agents of WMATA and do not have to provide explicit consent to be recorded, however, as an immediate action towards the question of consent to recording and signing a video release statement, Officers were instructed to place a star on the release form to indicate their wishes not to appear in the WMATA video and further direction would be sought from upper management since none had been given concerning MTPD's participation in WMATA's New Employee Orientation Video production.

15. On or around January 21, 2021, I was demoted to Sergeant in retaliation for my prior protected activity and more specifically, as a reaction to a complaint I had filed on September 15, 2020, against George Nader regarding his ethical violation of knowingly and willfully providing a false statement to MTPD Command Staff and other personnel participating in the virtual Departmental Safety Meeting. However, my complaint was swiftly dismissed. Shortly thereafter, I was placed under investigation for the charge of "Intentional Misrepresentation or Lying" in regards to my lodged complaint against Nader. It was at the conclusion of that investigation that a demotion was proposed as discipline.

16. On or around February 19, 2021, I was exonerated from any charges related to an investigation into alleged missing evidence. Deputy Chief Nader advised a complaint had been lodged by a colleague and made an erroneous allegation that I was unable to locate evidence (a buccal swab) and I attempted to place blame towards a CSS technician. The

evidence in question was never missing as it was revealed the CSS technician had submitted the swab under an alternate name, thus not being able to be searched with the evidence system. Had Deputy Chief Nader completed an initial investigation into the incident and allegations, he would have been able to reach this conclusion and find the missing evidence in question without needing to initiate a complaint against me.

17. On or around March 27, 2023, I earned a promotion back to Lieutenant and was reassigned to Patrol Operations. However, I was given what could be perceived as the worst of assignments, Patrol Operation, District 3 – Evenings. Male counterparts were assigned premium assignments within the Criminal Investigations Division *(daywork)*, Training Division *(daywork)*, Office of Professional Responsibility *(daywork)*, and even Patrol Operations *(daywork)*. While I had earned my rank back, which I had held before some of the promotees were even hired within the police department, I am still having to deal with the remnants of Pavlik biased regime.

____/s/ Tomika Holmes_____      _____December 4, 2023_____

　　Tomika Holmes                                                                  Date