### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **TOMIKA HOLMES,**<br><br>**Plaintiff,**<br><br>v.<br><br>**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,**<br><br>**Defendant.** | **Civil Action No. 22-1478 (JEB)** |

### <u>MEMORANDUM OPINION</u>

Plaintiff Tomika Holmes is a Black woman employed by the Washington Metropolitan Area Transit Authority in its Metro Transit Police Department.  She characterizes herself — not inaccurately — as "an EEO complainer."  ECF No. 15-3 (Def. Excerpt of Tomika Holmes Dep.) at 85:11–12.  After receiving a number of written reprimands for violations of MTPD policy, she believed that she was being unfairly targeted and thus filed internal complaints with WMATA's equal-employment office in 2018 and 2020.  But things only got worse.  Following several more disciplinary incidents, a five-day suspension without pay, a demotion, and pay deductions, Holmes filed a complaint with the Equal Employment Opportunity Commission and then brought this suit.  She alleges that her supervisors discriminated against her on the basis of race, sex, and color; retaliated against her for complaining about that discrimination; and created a hostile work environment — all in violation of Title VII.  Justifiably defending its actions, WMATA now moves for summary judgment.  As Holmes has not exhausted her discrimination claims, established a genuine dispute of fact about whether any of the adverse actions WMATA

took against her were retaliatory, or adduced any evidence of a hostile work environment, the Court will grant the Motion.

**I.     Background**

A.  <u>Factual Background</u>

Because the Court is considering Defendant's Motion for Summary Judgment, it will construe the facts in the light most favorable to Plaintiff.  <u>See</u> <u>Talavera v. Shah</u>, 638 F.3d 303, 308 (D.C. Cir. 2011).

Holmes is a Black woman who has worked for WMATA since 2001.  <u>See</u> ECF No. 14-1 (Defendant's Statement of Undisputed Material Facts), ¶ 1.  She rose through the ranks in the MTPD, eventually earning the title of lieutenant.  <u>Id.</u>; ECF No. 14-2 (Pl. Excerpt of Tomika Holmes Dep.) at 7:6–8.  At the time of the events giving rise to this suit, her immediate supervisor was Stephen Boehm, a white man who was a Captain until his promotion to Deputy Chief in 2020.  Kevin Gaddis and George Nader, both white men serving as Deputy Chiefs, were her second-line supervisors at various times.  And Ronald Pavlik, another white man, was Chief of Police.  <u>See</u> ECF Nos. 14-7 (2018 Internal Investigation) at 5, 7; 15-14 (Pl. Chart) at 1–2; 15-2 (Pl. Answers to Interrogs.) at 4, 8.

Holmes's troubles began on October 11, 2016, when she arrived at the station from a training session in her privately owned vehicle, dressed in civilian clothing.  <u>See</u> ECF No. 14-3 (2016 Reprimand) at 3.  This seemed odd to Captain Mitch Dowdy — a white male who was friends with Pavlik, <u>see</u> Pl. Answers to Interrogs. at 7 — because MTPD policy generally prohibits operating personal vehicles while on duty.  <u>See</u> 2016 Reprimand at 3.  Dowdy launched an investigation and found, over Holmes's protestations, that she had been on duty at the time he spotted her and had thus violated MTPD policy.  <u>Id.</u> at 4.  For that, he recommended a

reprimand, which Pavlik issued later that day, warning that "[s]imilar incidents may result in progressively severe discipline to include termination." Id. at 2, 5; see SUMF, ¶ 2. That reprimand, it turned out, would be the first of many.

Indeed, the next arrived some seven months later, in August 2017. See SUMF, ¶ 3; ECF No. 14-4 (2017 Reprimand). This one was sparked by a time-and-attendance audit that revealed "several discrepancies" between what Plaintiff had inputted into the time-keeping system and "what was denoted on the corresponding daily schedules." 2017 Reprimand at 2. Concerned that she might be misrepresenting her time and attendance, Boehm launched an investigation. Id. at 3. Plaintiff explained to him that "she kept her own 'bank' of additional time she worked past forty hours per week," and "[w]hen a day that she had previously requested leave approached and she had time in her 'bank,' she would . . . make a 'withdrawal' from her bank and then not input the [leave] into the system." Id. at 5. Unimpressed with that creative approach to tracking hours, Boehm concluded that she had violated MTPD policy by "fail[ing] to request permission when earning and using compensatory leave" and improperly claiming "compensatory leave for completing administrative tasks." Id. at 6. He suggested another reprimand, which Pavlik again issued with a note that more "severe discipline" could follow absent a performance upgrade. Id. at 2.

Things degenerated from there. That September, Holmes was working as "Watch Commander" when a bus operator was kidnapped by a passenger on the corner of 5th and H Streets in Northwest at about 2:51 p.m. See ECF No. 14-5 (Suspension Decision) at 3. Originally, the incident was classified as merely involving a "disorderly subject" until it was "revealed" to be "a kidnapping." Id. She learned about it at 3:25 p.m. Id. Although it was her responsibility as Watch Commander to inform her chain of command through a "Command

Page," MTPD Command did not receive an alert until 4:51 p.m. — and that came from the Bus Operations Control Center, not from Plaintiff. Id. at 4. In fact, Holmes never sent a "Command Page" about the incident; she only notified MTPD Command about it in her "Watch Commander's Report," which she sent at 6:19 p.m. Id. Boehm opened an investigation and, despite Plaintiff's insistence that she had done nothing wrong, found that she had violated MTPD policy by failing to send a "Command Page" regarding the incident. Id. at 4–5. Based on the "progressive discipline model," he suggested a five-day suspension without pay. Id. at 5. Pavlik accepted the recommendation and suspended her accordingly. Id. at 2; see SUMF, ¶ 4.

After an uneventful few months, Easter 2018 brought an unwelcome gift: more discipline. This time, it came in the form of a dereliction report prepared by Boehm. See SUMF, ¶ 5; ECF No. 14-6 (2018 Dereliction). The report stated that Holmes had failed to maintain an adequate level of staffing on the holiday. See 2018 Dereliction at 1. Specifically, she had "granted five (5) officers leave" on Easter Monday even though a number of other officers were in training that day, so other officers had to work overtime to compensate. Id. Holmes denied wrongdoing, explaining that she had approved the leave prior to receiving information about the training schedule. Id. at 2.

The next incident was that summer, when Holmes told Pavlik that "she enjoyed working the night shift," only to be "moved . . . to the day shift where she ha[d] greater contact with Captain Boehm." 2018 Internal Investigation at 2–3; ECF No. 15-1 (Pl. Statement of Material Facts in Dispute), ¶ 4. Pavlik later agreed that the shift change "would give [Holmes] more one-on-one time with [Boehm]." 2018 Internal Investigation at 2.

That proved too much for Holmes, and, on July 26, 2018, she filed an internal complaint with WMATA's Office of Civil Rights. See SUMF, ¶ 6; 2018 Internal Investigation 1–3. She

claimed that "[o]ver the past six years, African American members of the . . . MTPD[] have been disparately disciplined for actions for which white officers are not disciplined or receive a less[e]r level of discipline than their African American counterparts."  2018 Internal Investigation at 2.  Specifically, she alleged that Pavlik, Boehm, and Gaddis had discriminated against her because she is Black.  Id.  Following an investigation, the Office of Civil Rights concluded that "MTPD supervision ha[d] provided legitimate, non-discriminatory reasons" for each of the disciplinary actions taken against her.  Id. at 12.

The hits kept coming after that.  In November 2018, Pavlik sent Holmes a letter of reprimand for "fail[ing] to contact the subject of [a traffic] stop[] and conduct a preliminary investigation [into] the incident" after the subject expressed an intent to file a complaint.  See SUMF, ¶ 7; ECF No. 14-8 (2018 Reprimand) at 3.  Her fourth reprimand from Pavlik came just two months later, following an investigation by Boehm finding that she had "granted six (6) officers leave above the two (2) person allowance" that Boehm claimed he had given her.  See ECF No. 14-9 (2019 Reprimand) at 2; SUMF, ¶ 8.

Holmes filed a second internal complaint in August 2020.  See SUMF, ¶ 10; ECF No. 14-10 (2020 Internal Investigation) at 1–2.  This one focused on just Pavlik, who she alleged was continuing to discriminate against her — now based not only on her race, but also her color and sex — and had retaliated against her for the prior complaint.  See 2020 Internal Investigation at 1.  The Office of Civil Rights again investigated and found that her "allegations of disparate treatment[,] discrimination[,] and retaliation were not supported by the evidence."  Id. at 3.  That was not, however, the end of the saga.

In September 2020, Plaintiff sent an email to Nader, informing him that Captain Nopadon McKee — an "Asian/White" male, see Pl. Chart at 5 — had "lied to discredit and defame her" at

a department meeting earlier that day. <u>See</u> ECF No. 14-12 (Demotion Decision) at 1. Nader set out to investigate McKee's conduct at the meeting. Based on "information revealed during [his] initial inquiry," however, he decided to expand the scope of his investigation to include whether Holmes herself had violated MTPD policy. <u>Id.</u> at 1.

While that investigation was underway, one of Holmes's subordinates filed a complaint alleging that she had "ordered" him and another subordinate to sign a talent-release form that was supposed to be voluntary. <u>See</u> SUMF, ¶ 11; ECF No. 14-11 (2020 Dereliction) at 9. Nader undertook an investigation into that allegation, too, and found that Plaintiff had "failed to use good judgment when she ordered [subordinates] to sign a form that was consensual. By doing so[,] consent was negated and the form was signed under duress." 2020 Dereliction at 4. For that, Holmes received a written dereliction notice in December 2020. <u>Id.</u> at 9–10.

Meanwhile, Nader's investigation into Holmes's allegations against McKee and his own concerns about Holmes continued until January 2021, when he issued a 24-page investigative report. <u>See</u> Demotion Decision at 1–24. The report announced that Holmes's claims about McKee's misconduct were unsupported by the evidence. <u>Id.</u> at 14–15. As to Holmes herself, however, Nader found four violations of MTPD policy: she had "failed to work in a cooperative spirit with . . . McKee," "impeded [Nader's] efforts to complete [his] investigation," knowingly made false statements, and "lied" to discredit Pavlik. <u>Id.</u> at 16–17. For those violations, Nader recommended a written dereliction and termination. <u>Id.</u> at 20–21. The Assistant Chief of Police, Michael Anzallo — Nader's superior and Pavlik's subordinate — reviewed the report and filed a partial "non-concurrence." <u>Id.</u> at 26. Specifically, Anzallo disagreed with Nader's conclusion that Holmes had knowingly made false statements, and he recommended that Plaintiff be demoted rather than terminated. <u>Id.</u> at 26–27. Following a review of Nader's report and

Anzallo's non-concurrence, Pavlik accepted Anzallo's recommendations.  Id. at 28.  He thus informed Holmes on January 22 that she would be "demoted from the rank of lieutenant" to "the rank of sergeant" effective January 24, and that her "paygrade and pay" would change accordingly.  Id.

The next month, Sergeant Brandon Fletcher — a white male of the same rank as Holmes, following her demotion — accused her of a "receipt of evidence violation," alleging that she had failed to properly coordinate the transport of buccal swabs.  See SUMF, ¶ 13, ECF Nos. 14-13 (2021 Receipt-of-Evidence Disposition); 15-5 (Affidavit of Tomika Holmes), ¶ 16; Pl. SMFID, ¶ 5.  An investigation initially found that Holmes was "Exonerated," a mark denoting that the alleged "event occurred but was lawful."  2021 Receipt-of-Evidence Disposition at 1. Dissatisfied, Plaintiff filed a rebuttal asserting that "[t]he facts of the case should have led to a finding of _Unfounded_, as the allegations as cited were falsely reported or not factual."  ECF No. 15-11 (Rebuttal to 2021 Receipt-of-Evidence Disposition).  Nader consequently changed the finding from "Exonerated" to "Unfounded."  SUMF, ¶ 14, ECF No. 14-14 (Nader Email).  Still discontented, Holmes filed a complaint against Fletcher for making an unfounded allegation against her.  See Pl. SMFID, ¶ 9; ECF No. 15-4 (Harry Jacobs Dep.) at 108:15–19.  WMATA declined, however, to investigate Fletcher, confident that he had made the allegation "in good faith."  Jacobs Dep. at 108:20–109:21; Pl. SMFID, ¶ 9.

Summer 2021 brought more turmoil with a new cast of characters — namely, Amy Agcaoili, a senior payroll specialist in WMATA's Office of Accounting, and Meira Demissie, the "person in charge of . . . [time and attendance]" at WMATA.  See ECF No. 15-10 (Holmes-WMATA Email Exchange); Def. Excerpt of Tomika Holmes Dep. at 118:14–17.  Agcaoili emailed Plaintiff on June 2 to inform her that she had been inadvertently overpaid $367

following her demotion.  See Holmes-WMATA Email Exchange at 8.  To rectify that, Agcaoili explained, the Office would be collecting the overpayment in installments of $183.50 over the next two pay periods, starting on June 16.  Id.  Holmes replied promptly that "[t]here was no overpayment as [she] was due payment for overtime earned prior to [her] demotion which took several pay[]periods to rectify."  Id. at 7.  Copying Demissie, Plaintiff wrote that "Demissie should have communication and documentation in her files which can be provided as this was handled through her office."  Id.  Agcaoili responded, showing her calculations and the relevant paystubs.  Id. at 6–7.

On June 16, $183.50 was deducted from Holmes's paycheck.  Id. at 5.  That same day, Demissie chimed in on the email thread, stating that "[d]ue to the performance increases that took effect on January 31, 2021," upgrading her rate from $52.585764 to $53.637481, Holmes "was not overpaid and owes no monies back to [WMATA]."  Id. at 5.  She, accordingly, asked the Office to "terminate the second deduction and reimburse the $183.50" that had already been deducted.  Id.  Agcaoili was not persuaded, responding that the overpayment calculation already accounted for the performance increase, and "[o]verpayment amount remains the same and amount was deducted from the 6/16/[]21 paycheck was also correct."  Id. at 3.  Frustrated by this, Plaintiff emailed Agcaoili and Demissie: "So now it appears we have a different response and inaccurate justification for deducting earnings from my check."  Id. at 1.

Enough was enough.  On July 17, 2021, Holmes filed a formal charge with the Equal Employment Opportunity Commission and the D.C. Office of Human Rights.  See SUMF, ¶ 15; ECF No. 14-15 (EEOC Charge).  She claimed that many of Defendant's actions were retaliatory and created a hostile work environment.  See EEOC Charge at 1–2.  After some back and forth

with the EEOC, Plaintiff received a notification that her complaint was closed in February 2022.
See Compl., ¶ 9.

One note bears mention before the Court turns to procedural history: Holmes vehemently
disputes the merits of the aforementioned disciplinary actions, insisting that she never violated
MTPD policy and contesting some of the facts underlying the actions.  See ECF No. 15 (Pl.
Response to Def. SUMF), ¶¶ 2–5, 7–8, 11–12; Holmes Aff., ¶¶ 7–12, 14–15.  She also wrote a
number of rebuttals to the decisions contemporaneously.  See, e.g., ECF Nos. 15-6 (Rebuttal to
2020 Dereliction) at 1 (contending that her subordinate's complaint should "have been deemed
without merit on its face as MTPD Officers in uniform — as an agent of WMATA [—] fall
under implied consent to be filmed, recorded or otherwise photographed"); 15-7 (Rebuttal to
2019 Reprimand) at 1 (claiming that "there was never an order given restricting leave without
[Boehm's] approval"); 15-9 (Rebuttal to Demotion Decision) at 1 (expressing her "complete
denial of all allegations utilized to support discipline").  She does not, however, dispute the
existence of the underlying allegations or that the foregoing actions were taken.  The Court will
delve into her argument that unlawful reasons motivated them in Section III.B.3, *infra*.

B.  Procedural History

Holmes filed this lawsuit on May 25, 2022.  She contends that many of the actions
described above were discriminatory — on the basis of race, color, and sex — and retaliatory in
violation of Title VII.  See Compl., ¶¶ 35–51 (Count I: race discrimination), 52–67 (Count II: sex
discrimination); 68–84 (Count III: color discrimination), 85–100 (Count IV: retaliation).  She
also argues that those actions created a hostile work environment.  Id., ¶¶ 91–99 (Count V).
Since filing suit, Plaintiff has been promoted back to the role of lieutenant.  See SUMF, ¶ 16; Pl.

Excerpt of Tomika Holmes Dep. at 7:6–22, 8:1–6.  WMATA now moves for summary judgment

on all of Holmes's counts.  See ECF No. 14 (MSJ).

## II.     Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550

U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion" by "citing to particular parts of materials in the

record" or "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.

R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S.

at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington

Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The Court must "eschew

making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360,

363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than

mere unsupported allegations or denials and must be supported by affidavits, declarations, or

other competent evidence, setting forth specific facts showing that there is a genuine issue for

trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-

movant, in other words, is required to provide evidence that would permit a reasonable jury to

find in his favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

### III.   Analysis

Title VII protects federal employees from discrimination because of protected

characteristics — including race, color, and sex — and from retaliation for reporting

discrimination.  See 42 U.S.C. § 2000e-16(a) (discrimination); id. § 2000e-3(a) (retaliation).

Those protections extend not just to "'economic' or 'tangible' discrimination," but also

"include[] requiring people to work in a discriminatorily hostile or abusive environment."

Harris, 510 U.S. at 21 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).

Holmes advances discrimination, retaliation, and hostile-work-environment claims.  The

Court first discusses her discrimination counts (Counts I, II, and III).  It then turns to her

retaliation challenge (Count IV), which warrants lengthier treatment, and finally addresses her

hostile-environment allegation (Count V).

### A.   Discrimination (Counts I, II, and III)

WMATA assails Plaintiff's discrimination counts on multiple grounds — namely, that

her EEOC charge did not encompass her allegations, she failed to timely file that charge

following the alleged discriminatory actions, and she cannot show that WMATA's proffered

non-discriminatory reasons for those acts were pretextual.  See MSJ at 4–6.  Oddly, Holmes's

Opposition declines to address any of these arguments.  Indeed, even a cursory look at its "Table

of Contents" reveals no argument whatsoever about discrimination.  See Opp. at i.  Regardless,

the Court agrees that she never exhausted her discrimination claims and hence will not spill any

ink on Defendant's second or third grounds.

It is axiomatic that federal employees may bring a Title VII action in federal court only after jumping through certain hoops.  Specifically, before filing suit, "an aggrieved party must exhaust his administrative remedies by filing a charge of discrimination with the EEOC." Oviedo v. WMATA, 948 F.3d 386, 393 (D.C. Cir. 2020) (quoting Washington v. WMATA, 160 F.3d 750, 752 (D.C. Cir. 1998)).  After an employee files a charge with the EEOC and receives notice of final agency action, she has 90 days to file suit.  Id. at 394 (citing 42 U.S.C. § 2000e-5(f)(1)).  Properly exhausted claims encompass those that the EEOC charge and its accompanying documents detail with "sufficient information to put the agency on notice of the claim and to enable the agency to investigate it."  Crawford v. Duke, 867 F.3d 103, 109 (D.C. Cir. 2017) (cleaned up); cf. Marshall v. Fed. Exp. Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997) ("[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.") (citation omitted).

Defendants have the burden to prove a failure to exhaust, but a plaintiff who concedes that she has not exhausted her claim has the burden to show "facts supporting equitable avoidance of the defense."  Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997); see Clark v. Johnson, 206 F. Supp. 3d 645, 655 (D.D.C. 2016) (exhaustion "limits are not jurisdictional and 'are subject to equitable tolling, estoppel, and waiver'") (quoting Bowden, 106 F.3d at 437); cf. Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363, 1368 (D.C. Cir. 1998) (applying equitable estoppel when employer affirmatively misled employee to believe that grievance would be resolved in employee's favor); Broom v. Caldera, 129 F. Supp. 2d 25,

30–32 (D.D.C. 2001) (excusing non-exhaustion where administrative law judge misinformed complainant about proper procedures).

Here, WMATA argues that Holmes's allegations of race, color, and sex discrimination in Counts I, II, and III, respectively, are not exhausted because she did not include them in her EEOC charge.  See MSJ at 4–5.  Her response: silence.  See Warnnall v. Honeywell, Inc., 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").  Indeed, the word "exhaust" appears nowhere in her 196-page filing.  Nor does so much as a gesture at facts supporting equitable avoidance of WMATA's defense.

Even setting aside Plaintiff's concession, however, the Court agrees that her EEOC charge plainly did not encompass allegations of race, color, or sex discrimination.  In the section of the charge that asked Holmes on what basis she was alleging discrimination, she checked only the boxes for "RETALIATION" and "OTHER (specified below)," under which she wrote "Hostile Work."  EEOC Charge at 1.  She declined to check the boxes for "RACE," "COLOR," or "SEX" — the first three boxes that appear on the form.  Id.  When asked on the form for the "particulars" of her charge, Plaintiff wrote nothing whatsoever about race, color, or sex, describing instead WMATA's "reprisal" and "hostile working environment."  Id. at 1–2; cf. Boyd v. Dist. of Columbia, 2024 WL 324109, at *5 (D.D.C. Jan. 29, 2024) ("[A] claimant is not necessarily limited to the boxes she selected if she provides the basis for her claim in her written explanation.") (cleaned up).  There can be little doubt, therefore, that the charge lacked "sufficient information" to put EEOC on notice of Holmes's claims of discrimination — as distinct from her claims of retaliation and a hostile work environment — or to enable EEOC to investigate those claims.  Crawford, 867 F.3d at 109; Robinson-Reeder v. Am. Council on Educ.,

532 F. Supp. 2d 6, 13 (D.D.C. 2008) (dismissing claim of retaliation where "EEOC charge

fail[ed] to provide the slightest hint that plaintiff may have viewed the [challenged action] as a

retaliatory act").

That she alleged race, color, and sex discrimination in the internal complaints that she

filed with WMATA's Office of Civil Rights in 2018 and 2020 is of no moment.  See

Washington, 160 F.3d at 752.  True, the EEOC's regulations provide that "[a] complaint of

employment discrimination filed with an agency, which is transferred or referred to EEOC under

this regulation, shall be deemed a charge received by EEOC," 29 C.F.R. § 1691.6(a), but the

D.C. Circuit has held that WMATA "is not an 'agency' within the meaning of this provision."

Washington, 160 F.3d at 752.  Rather, its "internal procedures offer a separate forum for

pursuing discrimination complaints, which does not displace the . . . Title VII filing

requirements," id. — requirements that Holmes failed to meet.  Because Plaintiff's claims were

not exhausted, summary judgment is warranted on Counts I, II, and III.

    B.  Retaliation (Count IV)

We are nowhere close to the finish line, however, as the heart of Plaintiff's lawsuit is

Count IV, which alleges that a litany of Defendant's actions were retaliatory.  To prove

retaliation, a plaintiff must establish: "[F]irst, that she engaged in protected activity; second, that

she was subjected to adverse action by the employer; and third, that there existed a causal link

between the adverse action and the protected activity."  Broderick v. Donaldson, 437 F.3d 1226,

1231–32 (D.C. Cir. 2006) (citation omitted).  An activity is "protected" for purposes of a Title

VII claim "if it involves opposing alleged discriminatory treatment by the employer or

participating in legal efforts against the alleged treatment."  Beyene v. Hilton Hotels Corp., 815

F. Supp. 2d 235, 247 (D.D.C. 2011), aff'd, 573 F. App'x 1 (D.C. Cir. 2014) (citation omitted);

see also Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008).  Holmes indisputably engaged in three instances of protected activity: (1) filing her 2018 Internal Complaint, (2) filing her 2020 Internal Complaint, and (3) filing her 2021 EEOC charge.  See 2018 Internal Investigation at 1–3; 2020 Internal Investigation at 1–2; EEOC Charge; see also MSJ at 7.  To survive summary judgment, she therefore must produce sufficient evidence for a reasonable jury to conclude that she suffered adverse actions because of that activity.

Seeking to do so, Plaintiff identifies a smorgasbord of putative adverse actions that she thinks were retaliatory: (1) the repeated reprimands (including the dereliction notices) that she received beginning in 2016, see Compl., ¶¶ 16–17, 87–88; (2) the Suspension Decision, which suspended her for five days without pay, id., ¶¶ 16–17, 87–88; (3) her assignment to the day shift when she preferred the night shift, id., ¶¶ 20–21, 87–88; (4) the Demotion Decision, which demoted her from lieutenant to sergeant, id., ¶¶ 23, 87–88; (5) the investigation into her alleged receipt-of-evidence violation, which yielded an "Unfounded" finding, id.; (6) WMATA's failure to investigate her complaint against Fletcher, id., ¶ 27–29, 87–88; and (7) the docking of her pay in summer 2021.  Id., ¶¶ 31–34, 87–88.  Her Opposition identifies an eighth possible adverse action — i.e., the reassignment of Captain Boehm as her direct supervisor, instead of Captain Stanton Hamlin, a Black man who had previously been assigned to that position, see Opp. at 13; Pl. Answers to Interrogs. at 4 — but because nothing about that appears in her Complaint, the Court will not consider it.  See Reeves v. Fed. Bureau of Prisons, 885 F. Supp. 2d 384, 388 n.4 (D.D.C. 2012) ("The plaintiff cannot amend his pleading by presenting new factual allegations in his opposition to the defendant's motion to dismiss.").

The Court's analysis as to this count proceeds in three parts.  First, it briefly addresses WMATA's argument that Plaintiff's retaliation claims are not exhausted because the putative

adverse actions occurred more than 180 days before her EEOC charge.  Second, it determines

which of the aforementioned actions qualify as adverse within the meaning of Title VII's

retaliation provision.  Finally, the Court considers whether Holmes has produced any evidence

that would allow a reasonable jury to find that the qualifying adverse actions were retaliatory.

       1. *Exhaustion*

As explained above, a plaintiff suing under Title VII generally "must exhaust his

administrative remedies by filing a charge of discrimination with the EEOC within 180 days of

the alleged discriminatory incident."  Oviedo, 948 F.3d at 393 (cleaned up).  Because the D.C.

Office of Human Rights has entered into a "worksharing agreement" with the EEOC, however,

"the applicable time limitation for filing a charge of discrimination in the District of Columbia is

300 days."  Lee v. Dist. of Columbia, 733 F. Supp. 2d 156, 160 (D.D.C. 2010) (citing Carter v.

George Washington Univ., 387 F.3d 872, 879 (D.C. Cir. 2004)).  "Each discrete . . . act starts a

new clock for filing charges alleging that act."  National R.R. Passenger Corp. v. Morgan, 536

U.S. 101, 113 (2002).

This time, Defendant raises no question of whether Holmes's claims were adequately

encompassed in her EEOC charge.  See MSJ at 8 n.1.  Instead, it contends that she has a

timeliness problem.  Id.  Specifically, WMATA argues that "[t]he demotion and all events cited

in Plaintiff's charge of discrimination . . . occurred more than 180 days from the date Plaintiff

filed her external EEOC charge," on July 17, 2021, such that she "failed to exhaust her claims

that her demotion, and any of the other events cited in her charge, were because of retaliation."

Id.  That argument does not carry the day.  Even setting aside the aforementioned 300-day

window, Holmes's demotion, WMATA's investigation into Plaintiff's alleged receipt-of-

evidence violation, its failure to investigate Fletcher, and the docking of her pay all occurred

after January 18, 2021 — *i.e.*, within 180 days of her EEOC charge filing.  See EEOC Charge;

see also Demotion Decision at 28; 2021 Receipt-of-Evidence Disposition; Pl. SMFID, ¶ 9;

Holmes-WMATA Email Exchange.  Defendant neglects to explain why the Court should

nonetheless find claims related to those acts unexhausted or why the Court should apply a 180-

day rather than a 300-day window.

At the end of the day, however, each of Plaintiff's retaliation claims fails for other

reasons.  The Court will thus decline to dig into the nitty gritty of exhaustion here — which the

parties barely brief — and instead will consider all the supposed adverse actions and explain why

none of her claims based on those actions survives.

### 2.  *Adverse Actions*

A "materially adverse action" for purposes of Title VII's retaliation provision is one

that, objectively speaking, would have "dissuaded a reasonable worker from making or

supporting a charge of discrimination."  Baloch, 550 F.3d at 1198, 1199 n.5 (quoting Burlington

N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  It "[t]ypically . . . involves 'a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing significant change in benefits.'"

Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting Taylor v. Small, 350 F.3d

1286, 1293 (D.C. Cir. 2003)).  It conversely does not reach every "[m]inor . . . employment

action[] that an irritable, chip-on-the-shoulder employee did not like."  Id. (quoting Russell v.

Principi, 257 F.3d 815, 818 (D.C. Cir. 2001)); see Ramos v. Garland, 77 F.4th 932, 938 (D.C.

Cir. 2023) ("[T]he antiretaliation provision does not protect an individual from 'all retaliation,

but from retaliation that produces an injury or harm.'") (quoting Burlington N., 548 U.S. at 67).

While the retaliation standard historically "encompass[ed] a broader sweep of actions" than the discrimination standard did, see Baloch, 550 F.3d at 1198 n.4, the opposite is true after the D.C. Circuit's landmark decision in Chambers v. District of Columbia, 35 F.4th 870 (D.C. Cir. 2022) (en banc) (holding at 874–75 that for discrimination claims, adverse-action requirement obligates a plaintiff to show only that he was discriminated against with respect to his "terms, conditions, or privileges of employment" — not that he suffered an action carrying "objectively tangible harm"); see also Leach v. Yellen, 2023 WL 2496840, at *6 (D.D.C. Mar. 14, 2023) (describing post-Chambers differences in discrimination and retaliation adverse-action standards).

The perspicacious reader will recall that Holmes identifies seven putative adverse actions. Three of those — the suspension, demotion, and docking of pay — are textbook examples of actions that could "dissuade[] a reasonable worker from making or supporting a charge of discrimination" and thus handily meet the adverse-action standard. Burlington N., 548 U.S. at 67; see Baloch, 550 F.3d at 1199 (while "proposed . . . suspension" is not materially adverse, suspension "actually served" is); McManus v. Williams, 519 F. Supp. 2d 1, 6 (D.D.C. 2007) ("demotion" is a "recognized example[] of an adverse employment action for which an employee can bring a Title VII claim") (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)); Bain, 648 F. Supp. 3d at 57 (actions causing "financial harms" or "impacts" to salary qualify) (citing Baloch, 550 F.3d at 1199); Jackson v. Dist. Hosp. Partner, L.P., 2022 WL 3910501, at *8 (D.D.C. Aug. 31, 2022) ("The D.C. Circuit has noted that an actionable event is one that would 'affect the employee's "position, grade level, salary, or promotion opportunities."'") (quoting Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009)).

The repeated reprimands are a closer call.  That is because the D.C. Circuit "has held that formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions."  Stewart v. Evans, 275 F.3d 1126, 1136 (D.C. Cir. 2002); see Wade v. Dist. of Columbia, 780 F. Supp. 2d 1, 17 (D.D.C. 2011) ("[A] reprimand is generally not actionable as retaliation unless there is some evidence that it caused material harm to the employee.").  A formal reprimand can be an adverse action, however, if it serves as "a building block" that justifies an adverse action down the road.  Robb, 2021 WL 3036796, at *13; see also Huang v. Wheeler, 215 F. Supp. 3d 100, 109 (D.D.C. 2016) (criticism actionable where it "affect[s] the [employee's] grade or salary") (quoting Taylor, 350 F.3d at 1293); Kline v. Weichert, 2020 WL 2615528, at *9 (D.D.C. May 23, 2020), aff'd sub nom. Kline v. Ahuja, 2021 WL 5537701 (D.C. Cir. Nov. 23, 2021) (reprimand can be adverse where it is "used as a basis for another adverse action").

Here, although none of the reprimands that Holmes received was accompanied by a change in grade, salary, or other benefits at the time she received them, they were later used to justify her suspension and demotion.  See Suspension Decision at 2 (Pavlik acknowledging the 2016 and 2017 Letters of Reprimand and noting that "[t]his is third incident of a similar nature within the 'Rolling Year'"); id. at 5 (Boehm recommending suspension without pay "based on the progressive discipline model" because "[t]his is the third incident in less than a twelve (12) month period in which[] Lieutenant Holmes has committed a violation of MTPD/WMATA rules and regulations"); Demotion Decision at 28 (Pavlik explaining that demotion decision took into consideration Holmes's "previous discipline history [indicating] that [she is] incapable and unqualified to be a lieutenant with this police department").  As such, even if the reprimands would not have been adverse actions standing alone, the Court cannot conclude that no

reasonable juror could find them to be adverse here.  Cf. Robb, 2021 WL 3036796, at *14 (disciplinary letter that led to termination "would have dissuaded a reasonable employee from engaging in protected activity," thereby "meeting the materially adverse standard required for retaliation claims").  It will thus treat them as actionable adverse actions.

The same cannot be said, however, for the remaining three actions: the assignment of Holmes to the day shift instead of the night shift, the investigation into her alleged receipt-of-evidence violation, and Defendant's refusal to investigate her complaint against Fletcher.

As to the shift reassignment, the fact that Plaintiff preferred the night shift to the day shift — and expressed as much to Pavlik — does not render her assignment to the latter adverse.  See Opp. at 13.  On the contrary, "[a] substantial body of authority within this district holds that employees generally may not mount . . . retaliation claims on mere dissatisfaction with less favorable work assignments, which includes unwanted work schedules."  Achgazai v. Broad. Bd. of Governors, 2018 WL 4705799, at *7 (D.D.C. Sept. 30, 2018) (cleaned up); see Sims v. Dist. of Columbia, 33 F. Supp. 3d 1, 10 (D.D.C. 2014) ("[Being] required to temporarily work midnight shifts demonstrate[s] only 'less favorable assignments,' which, as the D.C. Circuit has explained, do not rise to the level of materially adverse actions for the purposes of sustaining a retaliation claim.") (quoting Jones v. D.C. Dep't of Corr., 429 F.3d 276, 281 (D.C. Cir. 2005)); Brown v. Georgetown Univ. Hosp. Medstar Health, 828 F. Supp. 2d 1, 9 (D.D.C. 2011) ("The mere fact that [the plaintiff] might have preferred to keep her previous work schedule or that the change might have inconvenienced [her] is not sufficient to make out an adverse employment action.") (citation omitted).

Holmes also postulates that the shift assignment "increased contact with Captain Boehm whom she had just filed a complaint against as her harasser."  Opp. at 13; Pl. SMFID, ¶ 4.  The

record evidence, however, proves that chronology false.  Plaintiff filed her complaint against

Boehm "as her harasser" on July 26, 2018, and she wrote in the complaint that the night-to-day

shift change had happened "[a]bout three weeks ago."  2018 Internal Investigation at 1–3.

Regardless, the Court recognizes that there may be circumstances in which being forced to enter

— or stay in — a "discriminatory work environment" fostered by a particular supervisor causes

actionable adversity.  Ortiz-Diaz v. HUD, 867 F.3d 70, 75 (D.C. Cir. 2017) (plaintiff who

proffered evidence that transfer "would likely have better advanced [his] career than staying in

the discriminatory work environment fostered by [his supervisor]" raised jury question).  But

Plaintiff does not produce any evidence beyond her own avowed dislike of Boehm that would

allow a reasonable juror to conclude that working the day shift with him caused her such

adversity here.

      As to the investigation into Holmes's alleged receipt-of-evidence violation, courts in this

district have repeatedly held that "although the discipline imposed as a result of an investigation

may have a sufficiently adverse effect on plaintiff's employment to be actionable, the mere

initiation of the investigation does not."  Ware v. Billington, 344 F. Supp. 2d 63, 76 (D.D.C.

2004); see Moore v. U.S. Dep't of State, 351 F. Supp. 3d 76, 95 (D.D.C. 2019) (similar); Leach,

2023 WL 2496840, at *7 (similar).  The only exception is when initiation of an investigation

itself triggers other legal consequences.  See, e.g., King v. Holder, 77 F. Supp. 3d 146, 151–52

(D.D.C. 2015) (investigation qualifies as adverse where plaintiff alleged that its initiation

delayed an otherwise automatic promotion); cf. Moore, 351 F. Supp. 3d at 95 (noting plaintiff

"does not allege any disciplinary or other employment action resulting from the investigation")

(cleaned up).  Here, the investigation resulted in no discipline or other consequence; indeed, the

ultimate finding was that the allegation was "Unfounded."  2021 Receipt-of-Evidence

Disposition; Nader Email.  The mere initiation of the investigation hence cannot qualify as a basis for Holmes's retaliation claim.

Finally, with respect to WMATA's failure to investigate Plaintiff's complaint against Fletcher, Holmes similarly comes up wanting.  An employer's "alleged failure to investigate alone does not make up a tangible, affirmative legally cognizable adverse action."  Runkle v. Gonzales, 391 F. Supp. 2d 210, 223 (D.D.C. 2005) (cleaned up); see also, e.g., Boyd, 2024 WL 324109, at *7.  Rather, "for a failure to investigate to constitute a materially adverse action, a plaintiff must explain how that failure led to 'demonstrable harm' or 'made it more difficult for her to pursue her claims with the EEOC or otherwise assert her rights.'"  Boyd, 2024 WL 324109, at *7 (citations omitted).  Holmes does neither, rendering the action non-adverse.

### 3.  *Retaliatory Motive*

The Court next considers whether Plaintiff has raised a jury question of retaliation based on any of the four qualifying adverse actions: the repeated reprimands, the suspension, the demotion, and the docking of her pay.

The Supreme Court has established a three-part burden-shifting framework that governs claims of employment retaliation.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of retaliation.  When he "meets this burden, '[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action.  If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext' for unlawful discrimination."  Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (quoting McDonnell Douglas, 411 U.S. at 802, 804) (cleaned up).

When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted).  The court's task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee . . . ?" Id.  The "relevant inquiry" is thus whether an employee has "produced sufficient evidence for a reasonable jury to conclude that the [defendant's] asserted non[retaliatory] reason for firing h[im] was not the actual reason, and that instead the [defendant] was intentionally [retaliating] . . . " Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016); see Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (foregoing analysis "appl[ies] equally to retaliation claims").

With that legal primer out of the way, the Court turns to the four adverse actions.  While Defendant's briefing may not be comprehensive, Plaintiff's Opposition is distinctly perfunctory, especially with respect to the issue of retaliatory motive.  Reading Holmes's brief charitably, the Court surmises her challenges to the rationales that WMATA offers and treats with the justifications for each adverse action in turn.

a.  Reprimands

Holmes first contends that the repeated reprimands were retaliatory.  That argument is, however, dead on arrival as to the 2016 Reprimand, 2017 Reprimand, and 2018 Dereliction, all of which were issued before Plaintiff filed her 2018 Internal Complaint — i.e., before she engaged in any protected activity.  See Payne v. Salazar, 899 F. Supp. 2d 42, 53 (D.D.C. 2012)

("For obvious reasons, . . . a plaintiff cannot base a retaliation claim on events that took place prior to the time she first engaged in [protected] activity."); Hill v. Kempthorne, 577 F. Supp. 2d 58, 66 (D.D.C. 2008) ("It is readily apparent . . . that [an adverse action] cannot in any sense constitute reprisal for the protected activity [that plaintiff] engaged in two months later.").

That leaves the 2018 Reprimand, 2019 Reprimand, and 2020 Dereliction.  The problem for Holmes is that WMATA has offered non-retaliatory reasons for all three — *i.e.*, that each was issued because Plaintiff engaged in a violation of MTPD policy.  See Williams v. Chertoff, 495 F. Supp. 2d 17, 31–32 (D.D.C. 2007) ("[T]he most common legitimate reason on which an employer might rely in disciplining an employee would be that the employee had violated an employment regulation or policy."); Chloe v. George Washington Univ., 2023 WL 6199076, at *9 (D.D.C. Sept. 22, 2023) ("[I]mposing disciplinary measures is legitimately warranted after an employee violates his employer's policies and procedures.") (cleaned up).  And she has produced no evidence that would allow a reasonable jury to find those reasons pretextual.

Begin with the 2018 Reprimand.  That letter followed an investigation by the Office of Professional Responsibilities into whether Holmes had complied with MTPD policy in relation to a traffic stop initiated by two of her subordinates against an MTPD employee.  See 2018 Reprimand at 3; Holmes Aff., ¶ 11.  Specifically, the Office undertook the investigation based on an allegation that Holmes had been "made aware of [an] intent to file a complaint against two sergeants," yet failed to "contact the subject of the stop" or "conduct a preliminary inquiry of events."  2018 Reprimand at 2.  That is a facially legitimate reason to undertake an investigation, especially because General Order #231 requires "[s]upervisors [to] conduct a preliminary inquiry into citizen's complaints and possible misconduct to determine if grounds exist for disciplinary action."  Id. at 3.  The Office prepared a report, concluding that "the evidence [was] sufficient to

support the allegation" against Holmes.  Id. at 2.  After "review[ing] the investigative report," Pavlik issued Holmes the letter of reprimand for violating General Order #231.  Id. at 3.

The 2019 Reprimand was similarly the result of facially legitimate decisionmaking.  The events leading to that reprimand began when Boehm "noticed on the daily schedule that A Section had eleven (11) officers on Annual Leave," a number that seemed concerningly high — especially in light of General Order #255, which requires "[s]taffing [to] be maintained at a level adequate to fulfill the mission and ensure the effective operation of the Department."  Id. at 3, 5. He thus had a reasonable basis for believing that the matter warranted an investigation.  With no idea that Holmes was involved, Boehm asked who had approved the members' leave for that day.  Id. at 3.  The individual who had sent the daily schedule informed him that a lieutenant named Brad Hanna had approved two members, Boehm himself had approved one, Holmes had approved six, and two other sergeants had approved one each.  Id.

At that point, Boehm contacted not only Holmes, but the others implicated, too, to ask "why they granted leave past the authorized two (2) members" that Boehm allowed.  Id.  Based on each of their statements and a review of the emails that they had sent to their employees, Boehm concluded that two employees — Holmes and one other — had violated MTPD policy by granting excessive annual leave in the absence of special circumstances.  Id. at 5–6.  He offered legitimate reasons for the discipline he recommended: because Holmes had granted six extra members leave and offered "alarming" "reasoning as to why she made the allowances," thereby reflecting an egregious misunderstanding of MTPD policy, while the other violator had granted only one extra member leave and showed no similar misunderstanding, Boehm suggested that Holmes receive a letter of reprimand and the other violator receive a dereliction notice.  Id.  Implementing that suggestion, Pavlik issued the 2019 Reprimand.  Id. at 2.

A facially legitimate rationale also justified the 2020 Dereliction.  The circumstances leading to that sanction came to light when one of Holmes's subordinates filed a complaint against her.  See 2020 Dereliction at 2.  The subordinate alleged that a film crew had videotaped roll call and that, when he was leaving, Holmes told him to sign a talent-release form.  Id.  The subordinate told her that he did not want to be in the video, but Holmes advised him that "that was not an option" and "order[ed]" him to sign the form.  Id.  Concerned that Plaintiff's order had negated the subordinate's consent and that he would be captured in the video footage against his will, Nader reasonably initiated an investigation.  Id.

After interviewing the complainant and another subordinate, both of whom expressed feeling that they had to "complete the form or face discipline" in light of Holmes's order, Nader interviewed Plaintiff herself, who "confirmed" that she gave the subordinates an order to sign the forms but placed a star on their forms if they did not want their images used.  Id. at 3–4.  Nader hence concluded that "Holmes failed to use good judgement when she ordered [them] to sign a form that was consensual" in violation of General Order #216, which requires members to "employ[] . . . good judgment at all times."  Id. at 4.  For that, he suggested a dereliction notice, id. at 5, which Anzallo signed off on.  Id. at 10.

Not keen on letting bygones be bygones, Holmes chiefly asserts that she did not violate MTPD policy in any of the above-described instances such that the 2018 Reprimand, 2019 Reprimand, and 2020 Dereliction all must have been retaliatory.  See Pl. Response to Def. SUMF, ¶¶ 7, 8, 11.  The question, however, is not whether she in fact violated MTPD policy, but whether WMATA reprimanded her because of a reasonable, justified belief that she did — such that it could not be said to have acted with retaliatory intent.  See Sims v. WMATA, 2022 WL 3354705, at *2 (D.D.C. Aug. 11, 2022) ("[T]he appropriate question is not whether the policy

expressly covers [plaintiff]'s conduct, but whether WMATA honestly believed [that plaintiff] violated the policy such that it could not be said to have acted with discriminatory intent.") (cleaned up); Hogan v. Hayden, 406 F. Supp. 3d 32, 46 (D.D.C. 2019) (similar); see also George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."). Plaintiff has not raised a genuine question as to WMATA's belief that it was appropriately reprimanding her for policy violations.

Instead of adducing such evidence, Holmes asserts that the reprimands had to have been retaliatory because "Captain Boehm and Chief Pavlik had knowledge of [her] extensive protected activity," including that she had accused both of them of discrimination and retaliation. See Opp. at 15; see also Def. Excerpt of Tomika Holmes Dep. at 85:11–12 ("I am known to be an EEO complainer."). That is hardly enough to survive summary judgment. To start, the record evidence reveals that neither Boehm nor Pavlik was involved in the 2020 Dereliction. See Leach, 2023 WL 2496840, at *10 (plaintiff cannot claim that particular supervisors "infected [a] final investigative report or any decisions that resulted from it, as they were in no way involved in the investigation of his alleged misconduct") (cleaned up). But even as to the 2018 and 2019 Reprimands, Boehm's and Pavlik's "mere knowledge of [her] protected acts is not sufficient to allow a jury to infer that [their] acts were motivated by retaliation." Brown v. Mills, 674 F. Supp. 2d 182, 197 n.8 (D.D.C. 2009); Farrington v. Mayorkas, 2022 WL 16834018, at *3 (D.D.C. Nov. 9, 2022) (same). Rather, "to defeat a motion for summary judgment, the plaintiff must submit proof beyond mere knowledge about protected activity and speculation that [defendants] harbored retaliatory animus against the plaintiff because conclusory allegations

unsupported by factual data do not create a triable issue of fact."  Barry v. U.S. Capitol Guide Bd., 636 F. Supp. 2d 95, 107 (D.D.C. 2009) (cleaned up).

　　She next claims that Pavlik and Boehm referred to her as a "problem."  Opp. at 16; see Pl. SMFID, ¶ 12 ("Chief Pavlik and Deputy Chief Boehm . . . refer[red] to her as a 'problem' because of her history of protected activity, all the while both Pavlik and Boehm launched baseless, unfounded, and wasteful investigations against her for the purposes of intimidation and retaliation.").  Yet she fails to offer any record evidence of those remarks.  She does not, for instance, mention it in her sworn affidavit or deposition testimony — only in her Opposition and Statement of Material Facts in Dispute.  See Leitner-Wise v. Clark, 2018 WL 6787999, at *6 (D.D.C. Dec. 26, 2018) ("An assertion of fact in an opposition brief does not amount to written evidence."); cf. Kirkland v. McAleenan, 2019 WL 7067046, at *19–20, 24 (D.D.C. Dec. 23, 2019) (unsworn statement insufficient to preclude summary judgment).

　　As a last resort, Holmes rests on evidence of temporal proximity.  See Opp. at 15.  This does not help her cause for two reasons.  First, none of the reprimands was sufficiently close in time to her protected activity.  The 2018 Reprimand was issued three months after her first internal complaint, which was her most recent protected activity.  See 2018 Reprimand at 3 (issued November 1, 2018); 2018 Internal Investigation 1–3 (complaint filed July 26, 2018).  The 2019 Reprimand was issued five months after it.  See 2019 Reprimand at 2 (issued January 4, 2019).  And the 2020 Dereliction was issued four months after Holmes's second internal complaint, her then-most recent protected activity.  See 2020 Dereliction at 2 (issued December 30, 2020); 2020 Internal Investigation at 1–2 (complaint filed August 28, 2020).  Although "neither the Supreme Court nor [the D.C. Circuit] has established a bright-line three-month rule," Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), this Circuit has generally found

that such gaps negate the temporal proximity needed to help a plaintiff prove causation.  See, e.g., Taylor, 571 F.3d at 1322 (rejecting interval of two-and-a-half months as establishing temporal proximity and citing, with approval, cases that did not find temporal proximity when two to three months elapsed between protected activity and adverse action).

Second, even if temporal proximity could help Holmes prove her *prima facie* case, it is "insufficient at the summary judgment stage to overcome an employer's legitimate, nonretaliatory reason."  Tobey v. U.S. Gen. Servs. Admin., 480 F. Supp. 3d 155, 167 (D.D.C. 2020); see Durant v. D.C. Gov't, 875 F.3d 685, 700 (D.C. Cir. 2017) ("Where . . . an employer has provided a legitimate, nonretaliatory reason for its employment action, positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanation is genuine.") (cleaned up); Minter v. District of Columbia, 809 F.3d 66, 71–72 (D.C. Cir. 2015) (granting summary judgment to employer because "positive evidence beyond mere proximity" is required "to create a genuine issue of material fact concerning whether the motive for an adverse employment action was retaliation") (cleaned up).

Having produced no positive evidence to help her cause, Holmes has shown no genuine dispute about whether the reprimands were issued with retaliatory motive.

### b.  Suspension

Next contending that Pavlik's decision to suspend her betrayed retaliatory animus, Holmes makes no more headway.  The same facially legitimate reason that justified the repeated reprimands justified her suspension: Defendant's belief that Holmes had violated MTPD policy. This time, the relevant policy was General Order #405, which requires that the Communications Division send the initial Command Page for kidnappings and the Watch Commander send any additional Command Pages — including when an incident that was not classified as a kidnapping

is reclassified as one.  <u>See</u> Suspension Decision at 4–5.  Boehm had a sturdy basis for

investigating whether Plaintiff had violated that policy and ultimately concluding that she had:

undisputed evidence that she neglected to send a "Command Page" to Command Staff after a

disorderly-subject incident was reclassified as a kidnapping.  <u>Id.</u> at 3–4.  The resulting discipline

was similarly facially justified: Boehm explained in his email to Pavlik that he was suggesting a

five-day suspension without pay based on the "progressive discipline model," given that this was

Holmes's third violation of MTPD policy "in less than a twelve (12) month period."  <u>Id.</u> at 5.

Pavlik accepted the recommendation in light of Holmes's "blatant disregard for the procedures

outlined in General Order 405."  <u>Id.</u> at 2.

        In response to that ostensibly sound explanation, Plaintiff insists that she did not violate

MTPD policy.  <u>See</u> Pl. Response to Def. SUMF, ¶ 4 ("Plaintiff <u>did</u> in fact provide a Command

Notification after having a conversation with the Deputy Chief of Patrol Operation, Kevin

Gaddis."); Holmes Aff., ¶ 9 (similar).  That is, however, not the question, as the Court has

already explained.  Her claim that Boehm and Pavlik must have acted in retaliation for her

protected activity because they were aware of it is similarly inadequate here.

        The only argument Plaintiff offers that actually goes to retaliatory motive is that the

investigation leading to the suspension "excluded any exculpatory information in order to ensure

a guilty finding against [her]."  Pl. Response to Def. SUMF, ¶ 4.  The "information" she has in

mind seems to be that "a notification [was] made" regarding the kidnapping, "a conversation

took place with . . . Gaddis" about it, she "spoke with the incoming Watch Commander" about it,

and "after the arrest . . . was confirmed, [she] was in transit to the District to complete

administrative requirements."  Holmes Aff., ¶ 9.  If the record evidence showed that her

supervisors in fact ignored exculpatory evidence so that they could conclude that she violated General Order #405, that may well establish pretext. But it shows no such thing.

As an initial matter, most of that allegedly "exculpatory information" was not "excluded" from the investigation. Quite the opposite: Boehm wrote in his investigative report that Holmes notified MTPD Command of the kidnapping in her Watch Commander's Report, spoke with the incoming Watch Commander about it, and headed to the District after the arrest was made. See Suspension Decision at 4 (noting that Holmes's "Watch Commander's Report," which was sent at 6:19 p.m., included an update on the kidnapping); id. (indicating that at 4:59 p.m., Holmes "spoke with incoming Captain, GREGORY HANNA[,] in order to complete a turnover of Watch Command" and "[d]uring the conversation, . . . notified Captain Hanna of the [kidnapping] arrest"); id. at 3 ("At about [4:04 p.m.], Lieutenant Holmes writes that she was en route to the scene when the arresting officer called out that he had one under arrest. At that time, Lieutenant Holmes writes that she rerouted to District I to complete her 'end of tour requirements.'").

More importantly, none of the allegedly excluded information is actually "exculpatory." Holmes was not disciplined for failing to make a notification, to converse with Gaddis, or to speak with the incoming Watch Commander about the kidnapping. Nor was she disciplined for neglecting to route herself to the District when the arrest was made. Rather, she was disciplined for failing to "send any Command Pages" about the kidnapping in violation of General Order #405. Id. at 5. Because she does not contend that there is any evidence that her supervisors ignored that would show she sent such a Command Page, she has not cast doubt on MTPD's proffered nonretaliatory reason for suspending her. Although it is not entirely clear from the record what a "Command Page" consists of or who is included in the "Command Staff" that

receives it, Holmes provides no record evidence that any of her actions were the functional equivalents.

    c. Demotion

   Plaintiff fares no better on her argument that her demotion from lieutenant to sergeant was retaliatory.  As before, Defendant has offered a legitimate reason for this action: its finding that she had engaged in three violations of MTPD policy — specifically, General Order #216. As relevant here, that Order requires employees to "work in a cooperative spirit to enhance the effectiveness of the Department" and "perform all duties impartially, without favor or affection or ill will and without regard to status, sex, race, religion, political belief, or aspiration" and prohibits them from "withhold[ing] information from, [being] untruthful, or fail[ing] to cooperate with an internal investigation."  Demotion Decision at 18–21.

   Nader developed a basis for believing that Holmes violated those rules during his initial inquiry into her allegations about McKee.  Id. at 1.  His lengthy report — based on a four-month investigation — walked through each charge, shared his observations as an investigator, summarized two interviews he had conducted of Holmes as well as numerous interviews he conducted of witnesses, and clarified any discrepancies in the information, before setting forth his conclusion, findings, and recommendations as to each charge.  Id. at 1–24.  Anzallo's partial non-concurrence provided an extra layer of review, indeed recommending a lesser penalty (demotion) than Nader's report had (termination).  Id. at 26–27.  In deciding to accept Anzallo's recommendation, Pavlik underscored the "comprehensive[ness]" of the investigation and the fact that "the report [was] sufficiently documented to support both its findings and recommendations."  Id. at 28.  And he took "in[to] consideration [Holmes's] time as a lieutenant along with [her] previous discipline history," which showed "that [she is] incapable and

unqualified to be a lieutenant with this police department." Id. In light of all that, the decision to demote Holmes appears to have been untainted by any retaliatory animus towards her.

Attempting to show otherwise, Plaintiff relies on her own affidavit, deposition, and rebuttal letter. See Pl. Response to Def. SUMF, ¶ 12 ("[S]he was demoted in an act of retaliation for her continued oppositional response to Chief Pavlik and Deputy Chief Boehm's continued discriminatory behavior and employment actions.") (citing Holmes Aff.; Rebuttal to Demotion Decision); Opp. at 13 (relying on Pl. Excerpt of Tomika Holmes Dep. at 86). All these show, however, is that Holmes deeply believes that she was retaliated against — not that a reasonable jury could infer from the evidence that she actually was.

Start with the demotion rebuttal, which Plaintiff sent to Anzallo and Nader shortly after her demotion took effect. See Rebuttal to Demotion Decision. She wrote that she "disagree[d] with the sustained allegations" and did "not believe the brief findings presented to [her] in writing nor verbally were comprehensive or sufficient to support the finding and/or recommendations presented," but failed to provide a factual basis for her belief. Id. at 2. She continued, "This discipline seems to be the unfortunate example of the retaliatory actions I spoke of in my September 2020 email sent to Deputy Chief Nader regarding speaking out against the systemic discriminatory and disparate treatment of minority members within MTPD, to which, this action has culminated. I find myself in disbelief at the continued blatant acts to find fault, defame, and discredit those who have chosen to speak out against disparities, highlight injustices, and address unethical behavior in opposition of certain demographics within the MTPD." Id. at 2; see also Opp. at 15 ("Plaintiff had been vocal that the January 2021 demotion from Lieutenant to Sergeant was retaliatory."). Yet Holmes's belief that her supervisors were acting with retaliatory motive — however forceful and frequently expressed — is insufficient.

Nor can the Court discern any other winning arguments from other parts of the record. For example, in her affidavit, Holmes avers that she "was demoted to Sergeant . . . as a reaction to a complaint [she] had filed on September 15, 2020, against George Nader regarding his ethical violation of knowingly and willfully providing a false statement to MTPD Command Staff and other personnel participating in the virtual Departmental Safety Meeting." Holmes Aff., ¶ 15. In support, she points to the fact that her "complaint was swiftly dismissed," and, "[s]hortly thereafter, [she] was placed under investigation." Id. The record evidence belies that story. For one, Holmes did not file a complaint "against" Nader on September 15, 2020; rather, she sent an email to Nader on that day, complaining about McKee. See Demotion Decision at 1. For another, her complaint (against McKee) was not "swiftly dismissed." On the contrary, Nader took four months to investigate it — the same amount of time he took to investigate the allegations about her — before finding that McKee had not engaged in wrongdoing. See Demotion Decision at 12–14. While it is true, moreover, that Plaintiff was "placed under investigation" after complaining about McKee, Nader explained that was because he had developed a basis, through his interviews of Holmes and others, for believing that she had violated General Order #216. Id. at 1. She offers no evidence that Nader — who was not the subject of either of her informal complaints — was motivated by retaliatory intent.

Plaintiff's deposition testimony likewise does not add much. When asked about her basis for believing that Defendant's rationale for demoting her was pretextual, she answered that she was "known to be an EEO complainer" who "fight[s] for justice against biases that are culturally known in MTPD from my experience," including by making complaints against "white males who are in this group of friends of Pavlik." Pl. Excerpt of Tomika Holmes Dep. at 85:11–86:8. She continued, "I think [the demotion] was retaliatory because like I'm going to show you. You

have been complaining about 15 years, 16 years, little girl, little black girl.  How dare you.  Yes,

you test higher than all these white men.  I don't care.  Yes, you come in here, and you work

harder than all of the white men.  I don't care.  Yes, you are liked by more people than any of

these white males.  I don't care.  Yes, you are very meticulous and want to do things the right

way.  I don't care.  I'm going to put you in your place . . . ."  Id. at 86:12–22.

While impassioned, her testimony is wholly insufficient to create a genuine issue of

material fact here.  See Alford v. Def. Intel. Agency, 908 F. Supp. 2d 164, 173 (D.D.C. 2012)

("It is not enough for Plaintiff to simply testify that he was retaliated against . . . .  The problem

for Plaintiff [is] . . . that absent supporting facts — and he has provided none — a jury would be

in no position to assess his claim that the [employer] had in fact retaliated against him.")

(cleaned up); Chandler v. Gruenberg, 266 F. Supp. 3d 355, 358 (D.D.C. 2017) ("[P]laintiff's

mere belief that she was retaliated against, without more, is simply not enough."); Greene v.

Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting such conclusory allegations as

true . . . would defeat the central purpose of the summary judgment device, which is to weed out

those cases insufficiently meritorious to warrant the expense of a jury trial.").

To be sure, when asked about her demotion for a second time later in the deposition,

Holmes tacked toward a different shore: comparator evidence.  She testified that MTPD "didn't

investigate the white males for any of the things that [they] investigated [her] about . . . that [she]

know[s] of."  Pl. Excerpt of Tomika Holmes Dep. at 129:9–11.  At first blush, this sounds

encouraging.  "Use of comparator evidence is the most commonly employed method of

demonstrating that an employer's explanation is pretextual."  Cienfuegos v. Off. of Architect of

the Capitol, 2015 WL 13653872, at *9 (D.D.C. Apr. 1, 2015) (cleaned up).  But Plaintiff never

states who the "white males" are whom she is trying to use as comparators, and she certainly

"does not establish, or even . . . attempt to show, that all of the relevant aspects of [her] employment situation were nearly identical to those of" the other employees.  Achoe v. Gensler, 2022 WL 16569241, at *5 (D.D.C. Sept. 29, 2022) (cleaned up); Cienfuegos, 2015 WL 13653872, at *9 (to successfully use comparator evidence, "plaintiff must adduce evidence demonstrating that similarly situated employees who did not engage in protected activity received more favorable treatment").  Her briefing is bereft of any further factual details, leaving her nowhere near showing pretext via comparator evidence.

### d.  Docking of Pay

Holmes finally challenges the docking of her pay in June 2021.  Defendant explains that the deductions were a result of inadvertent overpayment in January and February 2021 following her demotion from lieutenant to sergeant on January 24, 2021 — as Agcaoili told her via email before the first deduction.  See Holmes-WMATA Email Exchange at 8 (Agcaoili writing, "Job record shows that you have been demoted and resulted an overpayment for one pay period for $367.00.  Payroll will collect the overpayment for $183.50 the next 2 pay periods beginning payday 6/16/21."); see also id. at 12 (attaching paystubs for January 17–30 and January 31– February 13 pay periods purporting to show overpayment).

Plaintiff, for her part, does not dispute that her demotion came with a pay decrease.  See id. at 10–11, 40–49.  Nor does she contest that "someone state[d] that [her demotion] was the cause" of the deductions in June 2021.  See Pl. Excerpt of Tomika Holmes Dep. at 118:8–9. Instead, Holmes posits that she was never overpaid to begin with, and the deduction "was taken because specifically this white male" — meaning either Pavlik or Nader — "gave incorrect information and was so zealous about this demotion that they messed up the time."  Id. at 117:9– 15; see also id. at 118:7–9 (testifying that "the proof" of overpayment "was not there," and "[t]he

records were inaccurate"); id. at 119:7–10 ("I had all the records to show that's incorrect because the dates were put in wrong.").

This attack on WMATA's proffered rationale for the deductions in pay seems promising at first: Holmes's evidence raises a genuine dispute as to whether she was overpaid in January and February 2021.  See Holmes-WMATA Email Exchange at 48–49 (paystub indicating that during January 17–30 pay period, Plaintiff was paid at lieutenant rate for shifts worked between January 3–16 — i.e., before demotion was effective); id. at 45–47 (paystub indicating that during January 31–February 13 pay period, she was paid at lieutenant rate for shifts worked between January 17–23— i.e., before demotion was effective — and at sergeant rate for shifts worked between January 24–30 — i.e., after demotion); see also id. at 4–6 (Demissie email explaining why Holmes's payment was proper); id. at 10 (Holmes's email explaining same).  Were that enough to create a jury question, Plaintiff would be in good shape, even though one might justifiably wonder whether the Court's resources are best expended over $367.

Unfortunately for Holmes, even this is not enough.  That is because her task at summary judgment is to produce sufficient evidence for a reasonably jury to conclude both that WMATA's asserted nonretaliatory reason for deducting her pay — viz., to rectify overpayment — was not the actual reason and that the real reason WMATA docked her pay was in retaliation for her protected activity.  See Wheeler, 812 F.3d at 1114.  Yet Holmes has not adduced any evidence casting doubt on whether Agcaoili honestly believed that there had been an overpayment (even if there had not been) or suggesting that Agcaoili was acting with retaliatory animus.  See Sims, 2022 WL 3354705, at *2 (appropriate question is whether Defendant "honestly believed" explanation "such that it could not be said to have acted with [retaliatory] intent"); George, 407 F.3d at 415 (D.C. Cir. 2005); see also Dyer v. McCormick & Schmick's

37

<u>Seafood Restaurants, Inc.</u>, 264 F. Supp. 3d 208, 239 (D.D.C. 2017) ("To survive summary judgment, the evidence of record must be such that a reasonable jury could not only disbelieve the employer's reason, but conclude that the real reason the employer took a challenged action was a prohibited one.") (cleaned up).  In fact, Plaintiff has offered no evidence from which a reasonable jury could find that Agcaoili even knew about her protected activity — let alone acted in retaliation for it.  Nor has she put forth anything beyond mere speculation to suggest that Pavlik or Nader had something to do with the pay deductions.  <u>See</u> Pl. Excerpt of Tomika Holmes Dep. at 117:9–15.  No reasonable juror, consequently, could find that the deductions were in fact retaliatory.  <u>See</u> <u>Dyer</u>, 264 F. Supp. 3d at 239; <u>see also, e.g.</u>, <u>Morris v. McCarthy</u>, 825 F.3d 658, 673 (D.C. Cir. 2016); <u>Gray v. Foxx</u>, 637 F. App'x 603, 607 (D.C. Cir. 2015); <u>Jones</u>, 557 F.3d at 679.

*   *   *

To recap: even assuming that all of Holmes's retaliation claims were exhausted, summary judgment is warranted.  Her assignment to the day shift, the receipt-of-evidence-violation investigation, and WMATA's failure to investigate her complaint against Fletcher were not sufficiently adverse actions, and she has not created a genuine dispute of material fact as to whether any of Defendant's other actions were retaliatory.  The Court will thus grant the Motion with respect to Count IV.

### C.  Hostile Work Environment (Count V)

Last up: Count V, in which Holmes alleges that the same acts described above also created a hostile work environment.  "The bar for demonstrating a hostile work environment is a high one: A plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." <u>Achagzai v. Broad. Bd. of Governors</u>, 170 F. Supp. 3d 164, 183 (D.D.C. 2016) (cleaned up); <u>see also</u> <u>Ayissi-Etoh v. Fannie Mae</u>, 712 F.3d 572, 577 (D.C. Cir. 2013).  In evaluating a hostile-environment claim, a court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." <u>Baloch</u>, 550 F.3d at 1201 (citing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787–88 (1998)). By adhering to these standards, the court thereby "ensure[s] that [employment-discrimination law] does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." <u>Faragher</u>, 524 U.S. at 788 (citations and internal quotation marks omitted).  While a plaintiff need not prove a hostile work environment at this stage, he still must produce facts sufficient to allow a jury to find "extreme" conduct that satisfies the "demanding" standard for such a claim.  <u>Id.</u>

Holmes falls far short of meeting the high bar required.  As an initial matter, she cites not even a scintilla of evidence to support her hostile-environment claim.  <u>See</u> Opp. at 11 (citing Compl., ¶¶ 20–21, 23–24, 31–34, and nothing else); <u>see also</u> <u>Newton v. Off. of the Architect of the Capitol</u>, 840 F. Supp. 2d 384, 397 (D.D.C. 2012) ("The facts alleged in a complaint are not evidence for the purposes of a motion for summary judgment.") (citing Fed. R. Civ. P. 56(c)(1), (3)); <u>Bankers Standard Ins. Co. v. All-Pro Servs., Inc.</u>, 2020 WL 1695086, at *4 (D.D.C. Apr. 7, 2020) ("A complaint may get a lawsuit started, but it is not a source of facts for use in opposing a motion for summary judgment.").

At most, moreover, she points to the foregoing putative adverse actions, which are merely "work-related actions by supervisors" that "courts typically do not find . . . to be sufficient for a hostile work environment claim." <u>Munro v. LaHood</u>, 839 F. Supp. 2d 354, 366 (D.D.C. 2012)

(citation omitted); see also Bell v. Gonzales, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) ("Occasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile work environment.").  These actions do not rise to the level of conduct that is "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  Harris, 510 U.S. at 21 (citation omitted); see, e.g., Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing claim where allegations of "disparaging remarks, criticisms of [plaintiff's] work, and other negative comments d[id] not sufficiently demonstrate a significant level of offensiveness"); id. ("Nor can the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management be characterized as sufficiently intimidating or offensive in an ordinary workplace context.") (citations omitted).  The Court will thus grant Defendant's Motion with respect to this count as well.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  February 29, 2024